19-3042 et al. United States of America v. Lonnell Tucker for balance. Good morning, counsel. Counsel for Mr. Fields, is it Rosenweig? Rosenweig, your honor. Rosenweig. Good morning, Mr. Rosenweig. Whenever you're ready, please proceed. Good morning, your honor, and may it please the court. No, he doesn't. No, he doesn't. With those three words, Judge Maida made it clear that he misunderstood the nature of Mr. Fields' claim to self-representation, denying that it had a constitutional dimension, considering it only a statutory claim. This was legal error, and legal error of this sort is, as the Supreme Court has told us, per se an abuse of discretion. Since representational claims of this nature are structural, they are not subject to harmless error review. And it follows a fortiori that this court should reverse the decision of Judge Maida and remand this case for a new trial at which Mr. Fields may represent himself if he wishes. There's a Sixth Amendment aspect to this, and there's a statutory aspect to this, but is there any authority for the proposition that under the Sixth Amendment the right to self-represent is absolute when it's asserted in the middle of the trial? No, your honor, there is not. Our contention, however, would be that it is essential that the judge addressing whether or not to conduct a balancing test in mid-trial understand that the nature of the right being asserted is constitutional, not statutory. It's no different, for example, than if this court were to fail to distinguish between a constitutional claim of due process and a simple APA claim of failure to follow an administrative procedure. Constitutional claims always get a greater weight. Is there any reason to think, well, that might or might not be true, and there's a line of authority, there's a line of Sixth Amendment authority under Ferretta, and there's a line of authority under the statute. Is there any reason to think that for this kind of situation with the right asserted mid-trial that the balancing test would come out differently under one than under the other? We have no way of knowing that, your honor. We have no way of knowing how Judge Mado would have resolved this case had he properly valued the right, had he properly understood that it was constitutional in nature. Indeed, he said, I am confused. I don't understand, he said, why they, the D.C. Circuit, that is you, characterize it as a constitutional right because Doherty doesn't say that. That, of course, is because Doherty predated Ferretta by three years, and so he was relying on case law that predated the existence of this constitutional right. Our claim here is simply that without giving appropriate constitutional weight and value to the claim, he cannot, he has committed per se legal error, and as the Supreme Court has told us, that is always an abuse of discretion by definition, irrespective of whether or not the result might be the same had he done it the right way. We will never know that. We can't prove or contend about it counterfactual to any degree. Why would we think the constitutional standard is stricter? Usually, constitutional rights are a floor, right? There's a bare minimum of protection that a defendant gets, and Congress by statute or courts by rule can give a defendant greater rights. Why would we think that the statute gives the defendant less than he already would have had under the Sixth Amendment? Well, two reasons, Your Honor. The first is that the statute predates the recognition of the constitutional right by the Supreme Court, and had the Supreme Court thought that to be the case, they would have in Ferretta said that the statute suffices, which they did not. And the second is that I know of no case, and perhaps counsel for the United States can identify one, I know of no case in which any court has ever said the statutory right provided here is of greater moment or of greater significance and of greater protection than that which was provided in the Constitution. What about the speedy trial right? Isn't the constitutional speedy trial right a lot weaker for a defendant than the statutory speedy trial right? That's true, Your Honor. Obviously, there would be some cases in which Congress can magnify constitutional rights by statute. I would, for example, posit on the other side the differential between Miranda constitutional rights and the statutory Miranda case that was resolved in the Dickerson case many years ago, in which the court has pretty much said that the constitutional right exceeds or at least equals the statutory right. The question, of course, before us in this case is the nature of the right to self-representation. Mr. Rosenzweig, do you agree if we disagree with you about Judge Mecca applying the correct legal standard here, then do you think it's an abuse of discretion standard under which we need to review this decision? Well, I mean, it is clear that this circuit has never opined upon the standard to be applied to mid-trial assertions of a right to self-representation. The two cases that we've relied on before both were dicta, Doherty predating Ferreira and Washington involving not a claim of self-representation but a claim of a right to present closing argument. So the court would be free, I think, to adopt whatever standard it wanted to. For my position, I would advocate for a standard that gave weight to the constitutional right and said that the burden was on the government and the court to overcome that right with some showing of need. So abuse of discretion would probably be your standard of review, but I would import within that a more significant standard of assessment earlier on. I see that I am running out of time and I would be remiss if I did not, for at least a minute, turn to the Fourth Amendment issue that also is involved in this case. Imagine if a baseball player had hit a home run and then stood at home plate and said, I don't want to run, throw me another pitch, I want to take another swing at it. That would be nonsensical, yet that is what the government would have you believe Officer Haskett did with respect to his traffic stop of Mr. Fields. Having already, they say, hit a home run, that is, observed a traffic violation that provided probable cause sufficient to stop Mr. Fields, he nonetheless waited and, as he said, maintained the visual to see if the car would become mobile in an attempt to conduct a traffic stop for a traffic violation. That is to take a second swing at a second pitch and hit another home run. That makes no sense. The reality is, of course, that Officer Haskett had not observed a speeding violation, at least not one that he recalled immediately, and he was awaiting to see if there would be a drug transaction, as any reasonable officer might, or for the car to resume motion and to violate the traffic laws of Maryland. When neither of those things eventuated, he retrospectively realized that speeding had occurred and imposed that vision retrospectively on the reality he had seen before. But his own testimony to the fact that he was waiting for the car to resume motion is fundamentally inconsistent with that and, with respect, renders his testimony non-credible. For us, that means that Judge Maeda was clearly erroneous in his decision to credit that testimony and, with respect, ought to have discredited the testimony and not accepted it as a basis for finding probable cause to conduct the stop and, thus, to suppress that evidence, which was the fruit and the subsequent search of the barbershop, which was the fruits of the poisonous tree. Can I ask a question, Mr. Rosenschweig, about that last point, the fruit of the poisonous tree argument? Do you know, was that argument made to the district court? I believe it was, Your Honor. Okay. If it wasn't, do you think... I can't point you to it exactly in the record right now, but I believe it was in a post-trial brief, a post-hearing brief. Okay, very good. If by any chance it was not made to the district court, do you think that means that it's been waived? Yes, I would assume so, Your Honor. Yes. I appreciate it. Thank you. Thank you, Your Honor. I'll reserve the balance of my time, if I may. Do my colleagues have any other questions? All right. We'll hear from Ms. Schmidt now. Thank you, Your Honor, and may it please the court, my name is Emilia Schmidt. I'm representing Abdul Samuel, and today I'll be arguing the conflict of interest and ineffective assistance issues raised by Mr. Samuel. Mr. Samuel's trial counsel had a conflict. His daughter was applying for a position at the U.S. Attorney's Office while that lawyer was also representing Mr. Samuel. The lawyer never disclosed that to Mr. Samuel. He told it to the prosecutor, but he didn't tell Mr. Samuel, and he did not tell the trial court. And when the trial court found out about it, the trial court held that there was a conflict. So what comes next? And the Supreme Court says in Kyler v. Sullivan that if a lawyer was conflicted in the course of a criminal case, then there are two questions that have to be addressed. One, did the lawyer pull any punches? Was there a lapse in representation? And then two, was the lapse in representation actually caused by the conflict? And even if it wasn't caused by the conflict, then was the lapse still an effective assistance under Strickland? So we've established at least three lapses in representation, which I can talk about, but the question still remains, were those caused by the conflict or were those an effective assistance under Strickland? But either way, a hearing on remand is necessary to resolve these questions. So I'll start by talking about the council's failure to raise the issue that Mr. Samuels had been using cocaine 30 minutes before he spoke to law enforcement. So Mr. Samuels, again, he'd been using cocaine. This was not disputed at trial. The prosecution actually talked about it twice in closing, about how Mr. Samuels had been found by agents putting cocaine up his nose when the agents arrived at his girlfriend's house. 30 minutes later, Mr. Samuels talked to law enforcement. They asked him if they were going to find a gun upstairs. And Mr. Samuels said that there was a gun under the bed in his girlfriend's apartment for his protection. Mr. Samuels was charged and convicted of felony possession. And it was that statement, that was the only statement that convicted Mr. Samuels of the felony possession charge, because it was, again, it was his girlfriend's apartment. His girlfriend testified that the gun was hers. But the government played Mr. Samuels' interview in closing and said, listen, when he's pushed, he admits that there's a gun under the bed and that, and he says that it's his for his protection. So, sorry, what's the argument that the lawyer should have made that that statement was involuntary? Yes, that it was, well, that it was, it was not knowing or voluntary because he had been using cocaine 30 minutes prior to making it. And what do you do with lots of cases, Colorado versus Connolly comes to mind, which stand for the proposition that if the statement is not the product of coercion by the police, there's not a constitutional problem with it. Well, I believe it was, I mean, he had an obligation to at least raise it in a motion to suppress, given how important it was at trial. I mean, it's something that at least should have been litigated in a motion to suppress. How could it have succeeded? What's the theory that that statement was coercive because he was on drugs at the time? I don't think it's that it was coerced. It was that it wasn't, it wasn't knowing or voluntary. Because he had been using cocaine, he was not in his right mind. And the trial counsel did say in his motion to suppress that Mr. Samuels had been suffering from heroin withdrawal. But the problem is that, you know, again, I have a lay person's understanding of heroin withdrawal versus cocaine use, but they're not the same thing. And again, just given the, given how central the statement was to the government's case on the felony possession charge. This isn't an in-court right that's subject to the knowing and voluntary waiver standard. I mean, the default rule is if the police approach someone and talk to him, they don't have to mirandize someone outside of a custodial situation. And the person is free to speak or not, but it's fine for the police to ask the question. Well, we're not challenging the police asking the question. The issue is that the trial counsel didn't raise in his motion to suppress the fact that Mr. Samuels had been using cocaine. That's, that's the issue. And I mean, we at least needed. In order to do what? In order to keep the statement out on the theory that it was coerced or in order to challenge the reliability of the statement? To challenge the reliability of the statement. I'm sorry. I mean, it seems like neither one works. The coercion theory doesn't work for reasons that I said. And the reliability theory doesn't work because they found the gun. I mean, the statement was truthful. Well, they found a gun, but the question was whether it was his. And he said, you know, he didn't say it was his statement. He said it was for his protection. That's what the government, you know, the government characterized it in closing those and admission that it was his. But it was the only piece of evidence the government had, and we just we don't even have a record of why counsel decided not why counsel decided not to pursue that argument. We just don't have a record. And under the D.C. Circuit case law on remand for ineffective assistance claims. If there's no record of whether or not counsel. Pursued a strategic decision or why he didn't pursue it that that needs to be remanded to the district court to be litigated. So I realize I've I only have a little bit of time left, but I'd also like to talk just very briefly about the second error, which was the failure to investigate and timely challenge the government's expert on Schmidt. Yes. Just before you go there, we have to kind of we'll give you a bigger picture. It applies to all of the standard arguments, you know, in Strickland. When you do the first inquiry about performance, efficient performance, it obviously has to be, you know, quite bad performance. It can't just be slightly worse than ideal. Do you do you read Kyler as not the Kyler inquiry about how a conflict affected the performance of an attorney to be a different inquiry than that? And if so, tell me how how much does a potential conflict have to affect the performance of the attorney in order to satisfy Kyler? Well, I think there are a few questions there, but I'm not I don't know that Kyler lays out a bright line test about how much it had to have affected the performance of the attorney. I do think that under the D.C. Circuit, you know, what what takes all we do have from the D.C. Circuit about remanding conflict of interest claims. You know, the notion, the same notion that applies in the ineffective assistance context, I think, applies in the conflict of interest context, which is that, you know, if there is a question, if there's a question of how much it did affect the deficiency or the lack of representation, that's something that the trial court is best positioned to address because, you know, oversaw the trial. That's familiar with the record in the case. And with that large, what about when the sorry, go ahead. I'm finished with that. I had this I had a similar question. And you can think about it either in terms of the degree of deficiency, Strickland versus Kyler, or you might think of it in terms of how you prove causation, right? Strickland is a normal conventional causal chain, which is does the did the deficient performance cause prejudice or harm the defendant on the bottom line? Kyler is different. It's this odd idea of linking, linking the deficiency back to the conflict. And that seems like a hard thing for you to prove. So just to come back to the issue Judge Walker raised, which is how would you prove that a conflict of interest caused deficient performance if you look at the overall record? And it seems like it's a relatively minor mistake in the context of a representation where the lawyers seem to do a very good job overall. Well, there are a couple points there. I mean, I think in one on what you need to show, I mean, and what we would need to show. I mean, we just we don't have the record right now to show the causal link. I mean, we have some proffers from the government about certain dates in the hiring timeline, but we don't know, for example, when the trial counsel actually knew that his child was applying for employment. I mean, that's obviously an important fact that would have to be explored on remand. And, you know, I mean, for the reasons we've laid out in our brief, these errors in each worst areas to rise to the level of either ineffective assistance under Strickland or elapsing representation under Kyler. I think in terms of proving, you know, elapsed, I don't read the two cases to say that, you know, one has to be worse than the other under either standard. If that makes sense, I don't think Kyler and Strickland. It makes perfect sense, but it makes it a very hard case for you because deficient performance under Strickland is a tough burden to meet. Well, deficient performance and causing prejudice. I mean, yes, I understand in Strickland, you know, it's a high burden, but in the D.C. Circuit, all you have to do is show a colorable claim. You have to show a colorable claim of error and a colorable claim of prejudice. I mean, again, I think it's referred to as a standard practice in D.C. Rashad, Paul, Mohamed, go ahead. I get the point. I get the point that if it's a close question, you win in this procedural posture, win in the sense of get a remand. But I think we're just trying to understand conceptually how Kyler works in a case like this. Sure. And I realize there's not a lot of law in the D.C. Circuit on Kyler claims on remand. I mean, I know there's the McGill case where the D.C. Circuit did remand on both conflict claims and ineffective assistance claims. And there's the Taylor case remanded a conflict claim applying, you know, again, what's a liberal and effective assistance standard in the D.C. Circuit for remand. Ms. Schmitfeld, part of showing that there's a colorable claim in a Kyler type situation involves showing that there's some connection between the counsel's alleged conflict and the strategy that they pursued, right, or the mistakes. And I'm not sure that you've drawn out what that connection is in a colorable way. So one thing I do want to make sure is clear for the record. I mean, the trial court found there was a conflict. And I understand not even the government is challenging that on appeal. We're agreed there was a conflict. The question is, what is the connection to that conflict? Yes, exactly. But that's where, again, I think that's where a hearing is required. I mean, we just we don't have we just don't have the record at this point. And, you know, we don't have the record at this point to be able to litigate that fully. And that's why Mr. Samuels is here asking for remand again. What would you show other than the timeline of, you're saying one fact you need to know is what, when the lawyer knew about his daughter's progress with the U.S. Attorney's Office? Correct. That's at least one, you know, important fact we would need to know. And our position here is, you know, that we've identified three errors. But yes, the question is the timing. Oh, go ahead. So suppose let's take let's take the most favorable assumption for you, which is that the lawyer knew about knew about his daughter's situation before any of the lapses that you claim. What else would you what else would you try to probe? Like, let's let's spot you that one. And what else? This isn't I mean, in a typical Strickland situation, you would ask the lawyer, why did you make this tactical judgment or that? Was there a reason why you withheld the argument? Is that the kind of inquiry you want? I mean, presumably the lawyer's never going to say, oh, I didn't make this argument because I was embarrassed for my daughter. Well, like what you're probing, what you're probing is Strickland prejudice. I don't know how you probe, you know, Kyler causation. Did the conflict cause the lapse? Well, a couple of things. I mean, a hearing. We are also asking for a hearing on Strickland. And in fact, assistance, right, because that is the inquiry doesn't just end if you don't prove the causal link. But yes, you're on. Kyler is a little more correct. It's yes, it's odd. So actually, the cases that the court, the district court cited in its order, finding a conflict lay out some things that could be explored in a hearing on remand. I think the croaking case talks about submitting, you know, even at minimum written testimony from from the child about their their process of applying, like what they recall about when the other lawyer found out whether there are any discussions about the case. And then to your, you know, you mentioned, obviously, yes, trial counsel, you know, would be asked questions about whether or not the decision was strategic. But I think you would also want to ask questions about about the relationship discussions with with the daughter about the case. I mean, I think those are just basic facts that that should be explored on remand in the cases. The district court cited support that Okay. Any other questions from my colleagues. Just one mission. What, what do I do if I don't think that there was a potential conflict. So then you would. Well, if you don't think that there was a potential conflict. Right. I mean, you know, you noted that the government in this case didn't go out of its way to strongly contest your position that there was a potential conflict. If I think that, nevertheless, there was no potential conflict here. What, what do, what do I do with that. Well, a couple of things. I mean, one that still leaves the Strickland question right about it. Right. But to the point about the conflict. I mean, I think the, again, you know, there wasn't a lot of case law out there on this issue, I think, because The disclosure requirement is not onerous at all. It's, it's pretty easily done. And the fact that this didn't happen here. I think when it was shocking to the trial court from the record. And then when the trial and then the trial court, you know, ultimately found that, yes, this was a conflict and the cases that were out there supported that as did, you know, as we breached below the ethics opinions in DC also Also supported finding a conflict. But if your honor has specific questions about why you think there may not have been a potential conflict. I'm happy to address those Well, my question is more assume that I don't think there was a potential conflict. I know you disagree with that. Does that affect this courts and it was should that affect my analysis or should I should I say Look, the district court concluded that there was a potential conflict, the government doesn't contest that there was a potential conflict. It's appropriate for this court to therefore proceed on the assumption that there was a potential conflict. Yes, I think that's appropriate for the Why do you think that's appropriate. Well, because it's a it's a finding of the finding of the court. Why, why am I, why is this court, not in a position to disagree with that finding of the court. Well, or are we maybe we are I'm not, I'm not sure. I mean, I don't, I don't think that this court should I think there's a clear record below of why and why there was a conflict. And I mean, again, here, you know, the disclosure requirements not onerous and this There's a right under the Sixth Amendment to conflict free counsel that needs to be taken seriously. And when you have a situation where a lawyer's child is applying for a job. It's clearly under our under our PC code of excuse me PC professional ethics rules. It's clearly a personal interest conflict that The situation of an adult child living under a separate group is imputed to the parent. I think it's slightly different from the imputed so that the issue here about the conflict. Maybe right but like what's popping in my head is for purposes of financial disclosure rules. What what stock my grown children have when they're on their own doesn't matter. I don't need to know about that. It's not a conflict for me. Well, I think it can all it can all depend. I mean, it's a very fact based analysis, the relationship between between the lawyer, what the case involved. I think there there are different factors that can come into play here, you know, the, the rule says that if if the lawyer. If the lawyer has an interest that would be adverse to his clients. He needs to disclose that and, you know, again, there isn't a ton of law out there, but the extent there there was it's, you know, Even an adult child is applying and been hired by the office that's prosecuting your client in a criminal case. You need to disclose that to your client. And I mean, I know you mentioned the separate, you know, living under separate roofs. I think, you know, that goes to the question of the nature of the relationship. Right. And those are the kinds of factual issues that we need to be explored on remand. Factual issues, those seem to go to the question of whether there's a conflict, not necessarily to the question of whether there's a connection between the conflict and the representation. Well, I don't think that's the case. I mean, you know, the district court didn't need to consider all those defined under the ethics rules and the ethics opinions in DC and the any Court case law that's out there, Kogan and Shika from New Jersey, I believe that, you know, when you have a situation like this, where a child, even an adult child, is applying for and been hired by the office that is trying to put your client in prison, you need to disclose that to your client. So there's There's a conflict. But again, the question, but I do think they're separate analyses, but I'm happy to answer more questions. Imagine this hypothetical A partner in a law firm. There's a partner in a law firm whose parent is a justice on the Supreme Court. That law firm represents clients before the Supreme Court, although the partner of the law firm has a parent in the Supreme Court does not participate in that litigation. Do you think that that law firm has a potential conflict of interest, or do you think that the judge has the justice has a potential conflict of interest. So I believe there's a different rule in DC on that than the one that we were discussing than the one that was the issue below. I believe that is Rule 1.8H, if I'm not mistaken, although I may need to double check that, but that's a different rule. That governs situations when you have when you have a Someone's the situation you're describing where you have a judge on one side and then the child is actually at the law firm. But that's, that's not the Certainly every client has the right to a judge that's not conflicted. Yeah, well, just Stepping back into this kind of big picture. Do you think that the judge has a conflict in that hypothetical I think the more the core. I think the core analysis is the client has a right to know. I mean, Conflicts can be waived. Right. And that's the problem. That was the core of the problem that happened here is that the client didn't know the disclosure was never made. And so the client couldn't couldn't waive it. But I don't know if That answered your question, but I mean, assume that assume that the client represented by the law firm. My hypothetical was not informed about the parent, the parent child relationship. Do you think that That there was something a myth in that hypothetical I would I would say it seems in this, but again, I would say that that's a different that is a different issues in the one that we were that we were asked to Brief before the district court and that was before the district court. Okay. Anything else, Judge Walker. Okay. Okay, we'll give you some time on rebuttal. Thank you, Your Honor. Mr. Is it lacquer. It's a little car, Your Honor. Mr. La car whenever you're ready. Thank you, Your Honor. I intend to argue on behalf of the appellants to join issue of severance and transference and then on behalf of Mr. Tucker, his sentencing issue reserving two minutes for each of those two arguments for rebuttal. The trial judge at both the mid trial severance motion after Mr fields testimony with admirable restraint said that he thought Mr fields quote might not have been truthful. My submission to you is that every word out of Mr. Fields mouth, including a and and be was perjurious. On top of that, his conduct in the courtroom was obstructionist We've laid that out with the jury heard, among other things, was Mr fields at denying ledgers where he is in his handwriting denying text. He understood texted each scene were in it. He didn't understand the meaning. He accused the prosecutors of a witch hunt. He said that the prosecution was trying to frame everybody, including his two friends, my client and the Schmitz client. Because they couldn't find a case against the another target who he thought was the big fish. He accused the prosecutor of not understanding black culture. Under certain circumstances like this and I'll grant you that severance motions that are successful on appeal are rare, but this is one of them. The transference effect is real and it's tangible. Let me talk about Mr. Tucker for just a second. He consisted of two minutes of a 70 minute opening statement by the prosecutor. He shows up on about 7% of the trial record, not even full pages, but just 7% The evidence against Mr. Tucker was, it was, it was a, I would say, an acupoint. Yes. Did he have, was he accused of having a license to sell drugs? He was, he was on the scene, but nobody, aside from one sale, nobody ever said the text messages are not, are not connected with any of his co-appellants. There's no audio of him talking to the co-appellants. There's, there, there is a few, there are a few videotapes of Mr. Tucker and Mr. in the presence of Mr. Fields, but there's nothing to substantiate that they're transacting drugs under those circumstances. So what you had was, if I could submit, it's a manny case. It's a manny case in which you have a marginal co-defendant and Mr. and Ms. Schmidt's client as well, subsumed within an exceptionally perjurious obstructionist co-defendant, who, if I could borrow a phrase from one of the government's cases, the government talked about, cited a case called United States versus Piero, where the obstructionist defendant really was a sidelines cheerleader. My submission to you is that Jonathan Fields was the master of ceremonies and the host. The government seized on his testimony liberally as they rightly should have at closing argument and in rebuttal. And hammered home the fact that he had made these, that his testimony was replete with falsehoods. Under those circumstances, we couldn't, several should have been given, should have been granted because the reasonable jury could not have compartmentalized the evidence. It was overwhelming on this. The government's case against Mr. Fields was overwhelming. The connection to the defendants was somewhat tenuous. And in these circumstances, the curative instructions could not have saved the day and prevented my client from not receiving a fair trial. That's what happened in the Mardian case. That's what happened in the McLeod case, which I will grant you, the Fifth Circuit case was not a conspiracy prosecution. But as the Fifth Circuit pointed out, it was tried as if it were a conspiracy prosecution, where you have the lead defendant engaging in what I would call in-court obstructionism and constant perjurious comments. It has to have a transference effect on the lesser defendant, particularly lesser defendants of a nature like this. I'll address the sentencing issue. Before you do that, on severance, those are all fair points, but one consideration cutting the other way is that this issue with Fields came up, what, day 11 or 12 of trial? And asking a lot to start from scratch when something happens rather than try to mitigate the prejudice, give you free reign on closing to train your fire on Fields, give you cautionary and limiting instructions and such. Why isn't that at least a reasonable exercise of discretion in a pretty tough circumstance here? I will concede to you it was a tough circumstance, but a curative instruction didn't save the day in McCrae and it didn't save the day in Manning, and it couldn't have here. Even free reign would not have saved the day because the defendants, first of all, the prosecutor elicited from Fields, one of Fields' few truthful statements, that he had elicited from Fields that he was friends and grew up with the defendants. The prosecutor did that for legitimate reason, he wanted to draw the connection. You would have difficulties as a jury compartmentalizing and of course to recognize that there are circumstances, this is one of them, where you have lesser defendants, far lesser defendants, whose case can't be, the prejudice to whose case cannot be resurrected by curative instructions or by giving counsel opportunity to argue. What are you going to argue, Barry? The jury is going to sit and saw with their own eyes that, for lack of a better term, you'll excuse the slang expression, the homie is sitting up there and just lying through his teeth constantly and then acting out in the courtroom. How is the jury going to compartmentalize? They might make the effort, but there's a subliminal transference effect and that's what the court, that's what this court said in Martin, you have to be careful for that. It's not, it happens. Martin was a conspiracy trial and it was a successful sentence appeal, notwithstanding the fact that they went ahead and tried the whole case. So, the fact of the matter is they shouldn't have tried the whole case against Martin, they should have retried the case here, insofar as Mr. Tucker and Mr. Samuels were concerned. Are there any other questions? I'm happy to answer on the seventh floor in terms of sentencing. Okay, in terms of sentencing, I want to be very to the point, what the law of sentencing tells us is we shouldn't make unreasonable extrapolations and the district judge who did an admirable job otherwise in the case made a mistake. He made a mistake in methodology and the mistake that he made was assuming from one sale, one sale of half a gram of heroin, that there were three sales a week made from five, three sales a week for 30 weeks at a conspiracy. I think that's empirically unfounded, that in government doesn't make decisions based on such. Even though they know Tucker is regularly at the barber shop. Well, let's talk about that. He is in the area, I'll grant you he's at the barber shop, although how close is he to the barber shop? They placed him coming downstairs one time with an equivocal gesture. What is Tucker selling? That's the key to this case. There's no audio of what he's selling, there's no text of what he's selling. The government tries to claim that the district claims that the texts are more significant than they are, but district judge said, I can't figure out what those texts are all about. Clearly they're drug related activity, but what's the drug? There's no confession, unlike the government's cases. There's no seizures. There is nothing, literally nothing in the records to substantiate this extrapolation. And what the law teaches us from this court's decision to Stover, for Sepulveda, for Rivera-Maldonado, which are first circuit cases cited in our brief, and Kilby. The courts have an obligation to be very careful in making extrapolations because it causes, if you over extrapolate, if you make an unfounded assumption, it ratchets up the defendant's exposure dramatically. And that's what happens here. Mr. LaCar, I have a question that's similar to one of the questions I asked Ms. Schmidt. Assume I agree with you that the district judge made a mistake in sentencing, but assume that I think the mistake was that the district judge chose not to apply the career offender enhancement, which would have put the guidelines range between 210 months and 20 years. Your client got five years. Do you think that that issue is before this court? That's a terrific question. The answer is I think it is not. The government didn't cross appeal it and didn't claim it. They've waived it. So I think there's some force to that conclusion. And I candidly admit I probably lean a little bit toward that conclusion. But the counter argument to that would be that you did, through your appeal, put before this court the question of whether or not Mr. Tucker's sentence was a lawful sentence or not. And why does that not open the door to all questions regarding the appropriateness of Mr. Tucker's sentence? I think the door is open to the extent that the parties have briefed and addressed the issues that were raised as to the drug methodology and as the issue of harmless error. But the district judge's decision apropos of a career offender guideline and feeling that and correctly concluding that it overstated the case, that wasn't appealed by the government. If you were going to take it up here unilaterally, you'd have to say that's an issue of law. But in fact, the district judge saw it in a different way. The district judge saw it as a question of fact and judicial discretion. It hasn't been briefed. If you were to now say in this case, Judge Walker, that we're going to take a fresh look at it when it wasn't briefed on appeal, can you imagine what's going to happen in every other appeal that comes up before you where a party didn't brief an issue? They're going to say, well, look at that case. They got the right to get a second. The government got to get a second bite out of it. Is the reason that we can't take it up that the government didn't cross appeal or is the reason that it hasn't been briefed? Because if it's the reason that it hasn't been briefed, that's a problem that the court is now in a position to solve by just requesting supplemental briefing. We didn't raise it in a brief. We didn't raise the issue of whether or not Mr. Fields was properly determined not to be a career offender. That wasn't part of our appeal. Our appeal was very narrow. Our appeal was this. The methodology was wrong. The extrapolation was incorrect. And the government's response was, well, the methodology is fine and it's harmless error. And that's what was briefed. Very good. That's helpful. I have no further. I reserve the balance of my time unless anybody has any questions, which I'm happy to respond to. To draft. Thank you. All right. Thank you, counsel. We'll hear from the government now. Thank you, Your Honor. Good morning. Dan Lenners for the United States. I'm happy to address the defendant's arguments in any order that would be helpful to the court and to any depth that the court would like. But unless the court wants to direct me to an argument, I'll just go in the same order. When do we presumptively go roughly in the order in which they were presented? Yes. Thank you. The first argument the defendants raised was field's right to self-representation. I read the record differently than Mr. Rosenzweig. It does not appear to me that Judge Mehta misunderstood the scope of the defendant's right to represent himself when it first raises it during trial. When he first when this issue first came up, Judge Mehta, who's an experienced judge, who is an experienced defense attorney, recognized that field did and did not have a Sixth Amendment right. That timeliness was an issue that accurately describes the right of self-representation, which is sharply curtailed when a defendant first raises it after trial has begun. And in his balancing of the reasons, he was exercising discretion not to allow field to begin to represent himself mid-trial. He once again recognized that he had to take into account field's rights, but balance them against all of the other considerations. Can I ask you a question about that balancing? Most of the cases talk about, you know, the right balanced against the prejudice to the defendant. You know, here the district judge also considered the prejudice to the co-defendant. And I'm wondering if that is a permissible consideration for the district judge to take into account. I mean, given that the Sixth Amendment right is an individual right, can we balance that right against the rights of other individuals? Is that a permissible type of balancing in this context? I believe it is, Your Honor, because I believe it goes to the question of the disruption of the trial. That a defendant who's representing himself and who might be prejudicing his co-defendants by the questions he asks or the witnesses he calls is going to inherently disrupt the trial because the judge and everyone else is going to have to be on their toes to constantly stop lines of questioning, to interrupt answers, and to otherwise interject themselves into the process to make sure that this defendant field isn't prejudicing his co-defendants. So I do think it's part and parcel of disruption to the trial for the judge to weigh those two considerations. And you think that's true only after the trial has begun? Do you think it would be permissible to balance that type of consideration before a trial has begun? Before the trial has begun, a defendant does not have an absolute right to represent himself. The Supreme Court made clear in Feretta itself and in subsequent cases that even then the right is not absolute. But there I think that severance would be a much more appropriate response to a defendant who wants to proceed pro se as opposed to mid-trial when you're already a week into trial, have already had a week of evidence, that severance there is no longer as palatable a solution to this problem. So I do think that the judge, you know, I'm not as familiar with Feretta in the cases that say what a court is supposed to look at pre-trial. But it seems clear that once trial has begun, the judge has broad discretion to deny a defendant the right to start pro se mid-trial. And as we noted in our brief, I was unable to find a single case in which a court of appeals found that a judicial court abused its discretion by denying a mid-trial request for a defendant to proceed pro se. And the circumstances here certainly don't show an abuse of discretion, even if the judge misunderstood the nature of the right. Yeah, so are there cases equating the scope of the statutory and the constitutional right in this situation when it's asserted mid-trial or addressing one way or the other the question whether they would be the same or different? Not that I've seen. As I said, Your Honor, I read Judge Metas saying… No, I understand. That's your first line of argument. My second line of argument is in Doherty. Another argument in your quiver, which seems plausible to me, is if everyone agrees that it's a qualified right if asserted mid-trial and the judge gets discretion to balance, what difference does it make whether you call it a statutory right or a Sixth Amendment right? Yes, Your Honor, and I believe we made that argument as well. In Doherty, this court called the statutory right a fundamental right. It talked about its history as being one of the first things enacted by the first Congress. I think it was the day before the Sixth Amendment came up. And it talked about this history. And when the Supreme Court read this court's description of the statutory right in Feretta, it said it was intimating its constitutional nature. Ultimately, in Doherty, this court said we don't have to decide whether it's constitutional because the statutory right is fundamental. And Judge Meta read Doherty. He read Doherty into the record. So regardless of whether he had some misunderstanding of whether it was merely statutory or a Sixth Amendment right at the time he made his decision, he clearly understood that it's a fundamental right, that it was a weighty right, and that he had to balance that weighty right, regardless of its source, against the disruption to the trial and the other factors. That balance is going to be abuse of discretion standard. As to the Fourth Amendment's stop, the defense has provided no basis for this court to second guess Judge Meta's credibility finding after hearing the officers testify in person. This court, I'm not aware of any case in which it overruled a district court's credibility finding. In Delaney, it suggested that the testimony would have to be exceedingly improbable and either contradicted by empirical evidence or there's such a clear contradiction between witness testimony that the district court would err by crediting one of them. None of those circumstances exist here, and thus there's no basis to reverse the court's credibility finding or its denial of Fields' motion to suppress. As for the Samuel's conflict issue, I understand the Kyler standard to have three elements, a potential division of loyalties, a link or causal connection to an adverse effect on the attorney's representation. The focus of our argument. We're talking about the second and the third. You haven't contested the first. We have not contested for purposes of appeal the first. Why not? Your Honor, we made an internal judgment that we would argue as to the third issue that even assuming that for purposes of this appeal that this was a conflict that the adverse impact on Mr. Samuel's identified were not plausible alternative defense strategies. We did argue below that there was no conflict, that she was briefed before Judge Mata, he ruled against the government, and we have not proffered that here today as an alternative basis for this court. You don't concede that there was a potential conflict, correct? We don't concede that, Your Honor. And in fact, we think that were this court to remand to Judge Mata and for him to order a new trial, that we might still be able to appeal that ruling as it's kind of effectively interlocutory at this point. But we aren't. Please finish your sentence, sir. I was just going to say we aren't today arguing it as an alternative basis for affirmance. I think in my hypothetical about the law firm and the parent and who's a judge, I think that there's no potential conflict there. And I don't think that that law firm has a duty to disclose to its clients that the child of a judge is a partner in the law firm. Do you agree with me about that? Sitting here today, Your Honor, it's really hard for me. My instinct is to agree with you, but that instinct is not rooted anywhere in the law or in the code of professional ethics. I'm not an ethics expert. I'm not an expert in conflict. I was very much focused on it in my research on this case. Let me shift to Kyler a little bit. Mickens seems to suggest that Kyler might not apply in all conflicts cases. Do you agree that it calls into question whether conflict, whether Kyler applies in all conflict cases? Absolutely, Your Honor. That's what Justice Scalia said, joined by four members of the court. They said that issue is not before the court today. That was on the prejudice prong. They said, you know, whether Kyler's lower prejudice showing applies to all conflicts is not something the court decides today. They noted that the courts of appeals had unblinkingly applied it, but they didn't resolve that question because it wasn't before them at that time. Just one quick thought on this. You haven't bracketed prejudice as element four in this appeal, right? You're arguing the deficient performance as related back to the conflict. You're not arguing that we should ignore, as you would in a Strickland case, that we should just ignore the deficient performance because it didn't cause any prejudice. Well, I think our argument has been there can be no prejudice because there is no deficient performance. And that's why we didn't address prejudice separately. But we haven't argued, as Judge Walker suggested, that the court should follow Mickens' suggestion and treat the typical Strickland prejudice as applying to conflicts where there's no concurrent representation. That's what Mickens talked about. It said Kyler was multiple concurrent representation. Prejudice inured to that situation. And it said courts had since applied that sort of minimal prejudice showing unblinkingly. We have not argued today that this is the case in which this court should take up that suggestion. So focusing on lapse. What's your view on is lapse under Kyler the same thing as deficient performance under Strickland? Or is it something less? As I read the cases, it's something less, Your Honor. How much less? I assume it's something more than just, you know, not being Clarence Darrow. Yes, Your Honor. As I understand the standard as it's been applied by virtually every other circuit, they've said, you know, we don't understand what actual lapse in representation or adversely affected performance for Kyler means. So we're going to try to define that. And virtually every circuit, as I understand it, has said the defense has to identify a plausible alternative defense strategy that the defense attorney did not follow. The 10th Circuit has said a specific and seemingly valid or genuine alternative strategy or tactic that was available to defense counsel as the standard for lapse in representation or prejudice or whatever you want to call it. And so that's the standard we've applied in our brief to argue that the things that the defense identifies were not plausible alternative defense strategies. Some of them weren't even alternative defense strategies. For example, defense counsel did ask for a multiple conspiracy and construction. The district court had an independent duty to evaluate whether it should give that instruction when the defense had asked for it. They simply say the defense should have argued harder for it. That's not an alternative defense strategy. As for the link, I do want to be clear. We do not think that the defense has proven a link. But they've not had the opportunity to do that. Pursuant to an agreement that the parties entered before Mr. Samuels was sentenced, the government agreed and stipulated that Mr. Samuels could proceed to sentencing and take this appeal without prejudice to his ability to raise the conflict issue later. My understanding is that that, pursuant to that agreement, we cannot argue and are not arguing on appeal. We're not faulting Samuels for failing to prove that link. If the court disagrees as to the effect on representation, we believe he's in. So your only argument is no lapse? On appeal, yes, Your Honor. I understand our stipulation below. I have a concern about the stipulation and it's just gone up substantially in light of what you said. We have cases that say, notwithstanding our normal excuse of preservation requirements for ineffective assistance claims, if the defendant gets a new counsel at trial and that counsel has an adequate opportunity to raise the ineffective assistance claim, whether it's Strickland or Kyler, there's a preservation obligation. And this business of you agree that you won't preserve something the way you're supposed to preserve something and then come here and ask us to give you a remand because there was a by agreement, you know, you can't agree to change our preservation rules. Your Honor, I'm aware of those cases. I'm aware of Your Honor's concurrence and sits men. I agree with this issue multiple times. Durango. It's a pet issue of mine. I didn't see that being implicated here. I didn't see that being implicated here and let me explain why. Judge Mata appointed Ms. Schmidt and her partner as Mr. Samuel's counsel for sentencing purposes and to raise this conflict issue. He said, please only brief the existence of the conflict. Do not address prejudice. So the parties only briefed the existence of the conflict. Judge Mata then ruled against the government, said, I find a conflict. Now the parties need to brief prejudice. It's at that point that Samuels and the government agreed that he could proceed to sentencing without waiving his ability to show the requisite link and prejudice. And so we feel bound by that agreement, not to argue a lack of link. If the court has independent concerns, I don't see a Durango problem, but maybe Your Honor does. But why, if you have the new conflict-free counsel in place and the proceeding is still in the district court, I understand it was midstream. And as I understand it, there was some concern about not letting the briefing on the prejudice issue slow down the case, the other parts of the case. I get all that, but why couldn't you, why couldn't the counsel have done what I thought counsel should have done in Sitzman just on a post-trial motion, raise the issue on a post-trial motion? They could have, and they did. Judge Mata restricted their first post-trial motion to addressing only the existence of the conflict. That was all post-sentencing? No, it was pre-sentencing. The sentencing had been scheduled. Judge Mata discovered the potential conflict. He appointed new counsel, Ms. Schmidt and her partner, and he ordered new counsel to brief only the existence of the conflict, not prejudice. He then found the existence of the conflict, and it was ready to have the parties address prejudice, and the parties entered a stipulation to proceed to sentencing. So why shouldn't we think of that as the parties trying to erase a preservation obligation that the defendant has under Durango? He could have pursued, I mean, what Ms. Schmidt's saying here quite forcefully is, look, all I want is a remand for fact-finding, and that's a preferred thing in ineffective assistance cases where you have to develop the facts. I mean, you had that opportunity in the district court before the case came up here with the new counsel. I agree, Your Honor. As I noted in the brief, this is an unusual procedural posture. I would have made a Durango argument except for our stipulation. I don't feel as the government, given that we agreed… I respect your turning square corners once you have the stipulation. I'm questioning why you would have done that and whether the parties have authority to contract away preservation obligations and then come to us and say, please remand for a hearing that should have happened before the appeal was taken. Sitting here today, Your Honor, I'm not able to answer that question. I appreciate your candor. So as to the link, we do think that there are two ways the court can show a link. The court asked Ms. Schmidt quite a few questions about this. One is that there's such inherent tension between the attorney's duties of loyalty that there's necessarily causal connection. So when an attorney, for example, a defense attorney has also represented the witness or is concurrently representing the witness, the court has found sort of that inherent tension. There's no such inherent tension here. So then it's a because of. They have to show that Mr. Conte failed to take these actions because he wanted to advance his daughter's interests over Mr. Samuels. Sorry, this goes to causation? Yes, Your Honor. I was just trying to answer some of the questions. I thought you said you don't feel able to assert that here and now, given the stipulation. Yeah, I'm sorry if I lost the court. I've been trying to discuss the legal standard, not the factual record at this point. Oh, okay. This is just how Kyler works. Yes, the court had quite a few questions for Ms. Schmidt about that, and I was trying to give my best answer. With that in mind, go ahead. So I think there are two ways to prove it. One is this inherent tension, which doesn't exist here, and the other is because of causation. At the remand hearing, were one to occur, Mr. Conte would have to say, yes, I didn't take these actions because I sought to advance my daughter's interests over Mr. Samuels. Or he would say, no, I didn't, and the court would discredit that testimony. And there are cases in which the courts have suggested that this sort of post hoc testimony is not particularly credible. Here, we think it would be credible, but that has yet to be determined. We focused our brief on the third issue, which is this plausible alternative defense strategy, which we don't think that Mr. Samuels has shown here. And thus, we think that his sentence can be affirmed without a remand. The judgment can be affirmed without a remand because the three things that Ms. Schmidt has identified as plausible alternative defense strategies are neither plausible nor alternative. Tell me why the third of her three is a multiple conspiracy instruction? Yes, Your Honor. Did I hear you say that counsel did seek that instruction? Yes, Your Honor. I'm not recalling that. And the only performance concern is not arguing it forcefully enough. They say he should have pointed to specific evidence in the record that would have supported giving such an instruction. We don't think that evidence actually supports giving such an instruction. Oh, right. Okay. It's coming back to me. That's the nugget about trying to expand the business or trying to sell drugs in Virginia. Yes. They say, for example, counsel should have pointed to his post-conspiracy crack sales and crack possession as evidence in favor of a multiple conspiracy instruction. Why wouldn't that evidence tend to support the argument for a separate conspiracy instruction? So, as I understand the multiple conspiracy case law, it's that there has to be evidence that the jury could find this defendant guilty of a different conspiracy than the one charged. But the conspiracy charge ended on February 1st, 2018 with field's arrest and was not charged to have involved crack. And so pointing to Samuel's post-conspiracy crack distribution doesn't in any way tend to show that he was involved in a different conspiracy pre-February 1st, 2018 to distribute the drugs charged. It's just completely separate conduct. And the judge recognized that and routinely gave limiting instructions for the purpose, limiting the purpose for which the jury could consider evidence of things that occurred after February 1st versus pre-February 1st, recognizing that that's when the charge conspiracy ended. Is that because the later evidence is of planning to sell crack in Virginia in the future? No, it was to prove that he possessed with the intent to distribute the crack found in his house on May 10th, 2018. So, on May 10th, officers conducted a search warrant. That's when they found the shotgun under Mr. Samuel's bed and 4.2 grams of crack next to the sink. He was charged with possession with intent to distribute that crack. And so the evidence post-February 1st went to establish that charge. But the crack was not part of the charge conspiracy? No, Your Honor, crack was not even charged as part of the conspiracy. The conspiracy was charged to involve heroin, fentanyl, synthetic marijuana, and maybe suboxone. I see. So your theory is instruction or no instruction, the crack evidence wouldn't have tended to wouldn't have tended to implicate him in the charge conspiracy. Correct. And it didn't establish that he was involved in a different conspiracy than the one charged during the conspiracy period. I'm happy to address Samuel's other possible alternative defense strategies, but if the court has no questions, I'll turn to Mr. Tucker's arguments. Okay, go ahead. So, Mr. Lekar argues that the judge abused his discretion by failing to sever the trial after Fields gave his testimony. The proof is in the pudding that the jury could and did separate the charges and the defendants. It acquitted Mr. Wright of narcotics conspiracy. It acquitted Fields himself of possessing the firearms that were found in the upstairs kitchen and the barbershop. And it found that Mr. Samuels and Mr. Tucker were not responsible for various drugs charged in the conspiracy. And it acquitted Mr. Samuels of the 924C possession of a firearm and further drug trafficking offense crime. So, it's clear on this record that the jury, in fact, followed its instructions. And that those instructions suffice to cure any prejudice from Mr. Fields, you know, obstreperous and untruthful testimony, but testimony that didn't actually implicate his defendant, his co-defendants in any meaningful fashion. That's a good fact for you, but if we look at this ex-ante, and I understand it's a tough burden for the defendant, but boy, the contrast between Fields and the other two, both in terms of what they're actually doing, the degree of evidence against them, and the behavior at trial, seems pretty stark. I have two answers, John. One, this court doesn't look at it ex-ante. It has repeatedly used the fact of acquittals to support the district court's determination. As one consideration among many. Yes. Two, Fields' testimony, the Supreme Court in Zafiro, and this court following Zafiro, has said severance is not necessary when one defendant points the finger at his other, his co-defendant, and says he's the one who did it. Fields didn't even go that far. He may have been difficult, and he may have lied, but he lied about himself. His testimony touched on his co-defendants a little, if at all. His counsel elicited that they were friends. He said they were good friends, and that's about the extent of it. And the evidence overwhelmingly established that. I mean, there were photos of all of them together at various points. There were photos on Samuel's phone of Fields. Yeah, but didn't he say, I think it was Samuel's as opposed to Tucker, but as to one of them, he said that the person's presence in the drug log reflected auto insurance, right? Yes, that's what he said. So if he's showing himself to be a serial perjurer, and then he gives that nugget, how do we think of that? Does that tend to – does that have any spillover prejudice for Samuels by sort of showing that they're all in cahoots to perjure as well? As to sell the drugs? Not spillover prejudice to such a great degree that the district court abused its discretion by not severing the cases. It gave the correct instructions that this court has approved of in McGill and Moore and other cases. And as I said, the proof is in the pudding that if Fields was a serial perjurer, he denied possession of the guns in the kitchen and upstairs at the barbershop, the jury didn't hold that against him. It didn't say, oh, he must have been lying about that too. He must be responsible for the guns. I just don't think – and again, if a defendant saying it was his co-defendant who did it isn't enough to establish the necessity of severance, I don't see how the minimal amount – When he says he didn't do it, that's not enough. Yes, Your Honor. And then as to sentencing, the sentencing guidelines require the district court to estimate the amount of drugs involved. The district court does so under a preponderance of the evidence standard, and it comes to this court clothed as presumptively correct. And so nothing that Mr. Tucker has argued with regard to the district court's drug quantity calculation here is sufficient to establish that the district court clearly erred or to overcome that presumption of correctness. The evidence overwhelmingly established Tucker's involvement in heroin sales, his being at the barbershop constantly selling drugs as if he had a license to do so, and the completed sale to the confidential informant of 0.58 grams of heroin was a sufficient and factually correct basis for the district court to conduct the estimate that it was required to under the sentencing guidelines. And I would note the district court could have been wrong by 20% and still came to the same guideline calculation. The relevant band starts at 60 grams of heroin. 0.5 grams per sale is supported by the size of the sale to the confidential informant? Yes, Your Honor. Is there anything else? Any other completed sales? Any other evidence supporting that? That's the only evidence supporting the amount involved in any particular sale, other than the fact that, as the warrant affidavit shows, one time the confidential informant went to the barbershop to attempt to buy heroin from Tucker. Tucker wasn't there. He was referred to Venable as Lonel's man, El's guy, and Venable sold him 1.1 grams of heroin. So that further supports the quantities involved in these street-level transactions. And how about the five sales per week? The court made what it called was a very conservative estimate based upon the amount of time that Tucker was outside the barbershop selling drugs. The evidence overwhelmingly supports that he was constantly there. This court has said that when courts do this sort of estimate, they have to be conservative. One sale a day, not even each day of the week, is a very conservative estimate, as shown by the quantities for which Venable and Clark were responsible. Clark was responsible for between 150 and 300 grams of heroin as a street-level dealer of heroin involved in the same conspiracy. Venable, I believe, pleaded guilty to 360 grams of heroin. And so the district court quite correctly engaged in a very conservative estimate to reach only 75 grams of heroin for Mr. Tucker. Okay. Thank you, Ron. Judge Rao, anything else? Judge Walker? Okay. Thank you, Mr. Leonard. Let's move on to rebuttal. Mr. Rosenzweig. Thank you, Your Honor. A few very quick points in rebuttal. First, Judge Walker, to answer your question, ECF filing 69 was the motion to suppress as a barbershop evidence, and page 9, section 3B identifies the November 28th traffic stop as part of the grounds of the affidavit that was being challenged. To be fair, they did not say, in hac verba, fruits of the poisonous tree, but I think that that filing was sufficient to preserve the issue if you get to reach that. Second point, also on the issue of the traffic stop, Mr. Learns said that there was a lack of empirical evidence to reject Officer Haskett's credibility. I would point the court to Government Exhibit 10 from that hearing. It's an overhead visual of the CVS parking lot where the stop occurred, and you will see that in order to traverse the distance from where he entered the parking lot to where he parked, Mr. Fields traveled no more than 150 yards and made five separate turns, making it empirically, I would think, doubtful that he could have sped through the parking lot at the speed that the officer suggested. Third point, turning back to the question of self-representation, and to answer your point, Judge Katsas, there are indeed a number of issues where statutory rights and constitutional rights are repetitive to each other. Off the top of my head, I can think of privacy provisions, self-incrimination provisions, and due process provisions where the statutory rights are, I would think, inferior, and to take Judge Walker's point, there are other statutory provisions which are superior, I think, to constitutional rights. We do not have any case law here suggesting that the statutory right relied upon by Judge Maida was, in fact, superior to or more effective than the constitutional Coretta right, and the fact that no court has ever so held is suggestive, I think, of the fact that that is not the case. My final point on this would be simply that while Mr. Lerner correctly refers to Judge Maida's initial statement that was somewhat ambiguous as to his understanding of the constitutional nature of the self-representation-righted issue here, I think that we have to take that in context and realize that that was the first thing that he said, and that after he went off the bench, took some time to study it, and came back, he came back with a far more definitive statement. As I started this argument with, he point-blank said, Mr. Fields does not have a Sixth Amendment right to self-representation, without ambiguity, and he does and he doesn't that preceded that, and he then mischaracterized or characterized his understanding of Doherty as rejecting the constitutional nature of the right. That, we submit, is per se legal error and per se abuse of discretion, and thus, from our point of view, mandates a reversal and a remand for a new trial at which Mr. Fields may choose to represent himself, and presumably Judge Maida will manage that problem as he did the separance problem. Thank you, Your Honor. Questions from my colleagues? Okay. Thank you, Mr. Rosenzweig. Ms. Schmidt, let me give you a shot at the question I had for the government, which I haven't given you a chance to answer yet, which is, if I thought that the new counsel had an obligation to preserve the ineffective assistance issue under Durango, what is it that lets the parties stipulate away our preservation law? Thank you, Your Honor. So, I am not the expert on Durango that Mr. Lennartz has informed the court that he is. And I will answer your question. But, you know, first of all, I would, you know, in addition to joining in Mr. LaCar's arguments that he's made as to severance, I mean, I also agree with the point that he's made about the fact that the government has waived these issues and the concerns that Mr. LaCar raised about proceeding on an issue that the government's already waived. Yeah, that's fair. And that's normally the end of the matter if the upshot of the waiver is that the federal courts do less work than they otherwise might have, and we don't reach a forfeited issue. But here, you're asking us to do more work, which is remand for a hearing that should have happened before you took the appeal. Well, and so I'll talk about that piece of it. So, as I believe Mr. Lennartz noted, you know, my colleague and I were appointed after the trial on the eve of sentencing, which was when the district court found out about the conflict. I mean, my understanding is that the district court, you know, acted as quickly as it could. By the time that the district court found there was a conflict, you know, the parties convened, there was a status conference, there were conversations with the court between the government and defense counsel, and the district court was only willing to give 30 days to the parties to not just brief the issue, but I mean, to have a hearing, to prepare for a hearing and litigate it, which, you know, again, because, you know, we were new, you know, we were new counsel, we were not trial counsel, this was a three or four week trial with thousands of pages of transcripts that would have taken 30 days was not an adequate time to investigate and prepare for that. And in the meantime, and also, I mean, the court, and the court did not disagree with that. The district court, though, expressed, and I believe this is, this is laid out in the stipulation that the parties entered into, the district court felt that it could not give more than 30 days without materially prejudicing Mr. Samuel's rights on appeal. And in the midst of all that, the government had Why is that? Why is Why would taking whatever time was necessary to tie up the conflict issue materially prejudice? I mean, usually the district court ties up all loose ends as quickly as it can, and then there's an appeal. Nobody sought expedition, I don't think. Sure. Well, the at that point, I believe the the trial that happened in March or April of 2019 the other defendants had already been sentenced and we're proceeding to appeal. Mr. Samuel's not even sentenced. And I think this is also discussed in the transcript of the status conference, but I think it just, to answer your question about why it would prejudice him, I mean, if Mr. Samuel's took additional time to litigate this one issue, and then, you know, he would potentially prejudice his ability to litigate other issues that he might have raised on appeal. For example, the severance issue that we're raising jointly. Sorry, is that because his appeal would have happened too late to be consolidated with the other ones that were out in front of it. Correct. Okay, I got it. Great. So, so there was that issue. And then on top of that, the government council had indicated to defense counsel that if if we were to litigate it and Mr. Samuel's were to prevail on this, you know, was, you know, was in jail. And I think this is also discussed in the stipulation. There was a detainer against Mr. Samuel's in the Commonwealth of Virginia. So Mr. Samuel's was potentially looking at spending a significantly longer amount of time incarcerated than he would if he otherwise proceeded to sentencing. And then just litigate this on appeal. I also want to note, just on a related note, so I think Mr. Leonard said that the court had ordered a briefing on prejudice. I think that's true, but the court's order also said, you know, we, we need to identify But we haven't, you know, I haven't considered whether or not there were actual errors in the representation. So to do that, again, also would have involved some additional investigation and and time to litigate. And here on appeal, you know, we've identified three errors that we think did rise to the level of the lab. And what we're asking for now is a remand to address the additional causation issue under Kyler and alternatively a prejudice issue under Strickland. Any questions from my colleagues. Okay, I had a few additional points on Quickly, you're well over. Yes. On the on the hypothetical. Your Honor, Judge Walker raised I I've gone back and looked at some of the rules. I believe the question really comes down to whether a reasonable client want to know. I think I said that, but on the on the hypothetical of a Attorney in a firm is at a firm that's litigating cases in front of a particular judge. Do you think that would be a personal interest conflict. As to the as to the judges child, it would not be imputed to the firm, but the judges child would have to disclose it if if there was a question of whether a reasonable client wants to know. So, Doesn't that cut cut pretty hard against you then because here the the prosecutor's daughter. Sorry, the defense attorney's daughter was not the the prosecutor on this case. Well, again, here, the standard is a personal interest conflict. What matters is just she was applying for a job and the rule says if a lawyer has a personal interest. Has a personal interest that would affect his ability to represent his client. He needs to disclose it to the client and the standard is whether a reasonable client would want to know about that interest and here there's a report found that based on the case law based on the DC ethics opinions. Yes, that's the conflict that a reasonable client would want to know about and it should have been disclosed. So, okay. Thank you. And I just a couple of quick additional points. I just want to talk briefly about this issue of Mickens versus Kyler. So I believe I understand Mr. Leonard says Position and you know what the dissent has said about not applying the Kyler standard to cases like this or trying to limit the reach of Kyler I think the precedent that is available in the DC circuit cuts against that. I mean, I know that Kyler says, yes, if If you're dealing with a case where there was dual or concurrent representation. That's a per se conflict. We're not arguing here that this was a per se conflict. We agree that that Mr. Samuels needs to prove Causation. And if you look at the DC circuit cases that address conflict. I mean, they address in remand cases that don't just involve, you know, dual or concurrent representation. The Taylor case. Involved the remand where it appeared that the client potentially had an advice that counsel defense trial, they could have used and instead that Council advised him to plead guilty. And so the district court remanded it. So I think I would not read Kyler as narrowly as the government is arguing, and I think the DC circuit precedent supports that and then Give you one. Go ahead. Take your best take your best shot of what you have left. Yes. And on the the multiple conspiracies argument, I would say, I just want to, I do want to clarify a couple things because I think the government mischaracterizes the record on some important points. So it's not just that Mr. That Mr Connie failed to sufficiently argue it. It's that the district court directly asked him a question and or made a comment. That said, he said, I'm going to give this multiple conspiracy instruction to Mr tougher because I think the evidence is there because there's evidence that he was interacting with unidentified individuals outside the conspiracy. And I don't see that evidence. The court was saying, I don't see that evidence here for your client, Mr Connie and Mr Samuels lawyer said Well, that's correct. But that was not correct. It was a misrepresentation of the evidence. I mean, there was there was a text and it's text from, you know, within the charge conspiracy period period that the government's talking about in 2017 Where the government pointed to it. How did introduce the trial where it said, Mr. Samuel texted An unidentified individual and said the guy will go to or I will go through will give 3.0 for 150 so let your client know that, again, that was within the period of the charge conspiracy and second on the the testimony from Mr Clark. Sorry, what do you say to The government's position that that was just that wouldn't have been within the conspiracy anyway because it's a different drug. Well, I mean, the problem was that it led to it. It led to sure confusion. I mean, there was always going to be a risk of that because of the way the government charged and litigated the case against Mr Samuel As the government said he was charged with possession with intent to distribute cocaine and he was charged with participation in this conspiracy to distribute heroin and that text. Again, you know, the government said it was about coded, you know, coded message for drug transactions unclear. It's just unclear what he which drug we're referring to, but it is within the period of the conspiracy. Okay. Okay. Okay. Thank you. And then I was going to talk really quickly about the Mr Clark's testimony, just that I think the record is not as clear as the government characterizes that and we we disagree that That the judges instruction would have would have cured that I think the instruction was Mr Samuels to lose and it was it was a lapse in representation to have led the court to believe that the facts were were not there to support it. All right. Thank you. Thank you, Your Honor. The government's point apropos of the jury's acquitting people various charges. I want to focus on Mr Tucker for a moment. Where that heroin come from. There wasn't any evidence in the record where that heroin came from. There wasn't any evidence that him dealing with john Jonathan fields to without heroin, the photos that the government talks about what they're ambiguous. Again, no audio no cooperator testimony linking my client to any specific sales or any, any sales of heroin. So you have a case, I think a pristine case of transference in terms of the government's argument and the sentencing. They say, well, it was presumptively correct. Well, the methodology isn't presumptively correct methodology should be reviewed de novo. And here, being there at the barbershop doing what there are no other sales in a record. The government points to Mr venerable judgment issue the reference to any reference to venerable sales he judged Mr Tucker on what he thought, and I say incorrectly so he had Mr Tucker had sold in furtherance of a conspiracy. What's your theory. What's your theory for what Tucker was doing at the barbershop every day. My theory is he's hanging around he's got multiple sources of supply remember judge Walker he did get a multiple conspiracy instruction. The only one in the case who got that. So he had multiple sources of five, and this is important to note this as well your honor. He's not up at Barnaby place, or is it Barnaby Street I can never get it straight in my own mind but he's not up there at the retail location, where a number of those who were charged and others who flat out were said to have been selling retail drugs. He's a hardscrabble drug dealer. I don't know where his sources are from after judge matter was struggling with as well with the text. Now, if I could just walk I want to circle back to that dialogue you and I had about waiver. My first statement is, I probably should not have used the word waiver probably more of a forfeiture argument than a waiver but it's same effect. In the end, in terms of putting aside the legal niceties. I want to deal with this on a practical terms. This is a court of appeals in general, we give respect to the institutional role of the district judge, who's got the close appeal at sentencing. So my, I'm not asking you to be a social scientist. I'm not asking any of you to tolerate anything alone out Tucker did he's, I want to concede to you, he's a small scale drug dealer, but an age and an age of overcrowding a dramatic over sentencing judge matter saw this and the government, I think subliminally, and not cross appealing recognized as well. This is a career offender guidelines this court doesn't need to reach out for that where the parties didn't address it wasn't brief, and nobody, nobody, nobody addressed it till it came up here. felt that the career offender guidelines themselves offended his sense of justice, and I tip my hat to him because they do. What is Lynell Tucker, other than a hardscrabble small scale drug dealer. He's not, he's not a career offender. And I think the court should respect this. These cases. I have no further observations. All right. Thank you all for argument. The case is submitted.
judges: Katsas, Rao, Walker